**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Rodolfo ECHEGOYEN,**
**Defendant-Appellant.**

**No. 83–5295.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 5, 1986.

Decided Sept. 12, 1986.

---

Ralph C. Hofer, U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Robert Allen, Los Angeles, Cal., for defendant-appellant.

Before PREGERSON and HALL, Circuit Judges, and ORRICK,* District Judge.

---

* Honorable William H. Orrick, Jr., United States District Judge, Northern District of California, sitting by designation.

PREGERSON, Circuit Judge.

## OVERVIEW

Rudolfo Echegoyen initially pled not guilty to an indictment charging him and various others with several counts of federal narcotics law violations. Echegoyen filed pretrial motions to suppress certain evidence seized by law enforcement officials in two separate searches. The district court denied these motions. Thereafter, Echegoyen entered a conditional plea of guilty to three of the counts in the indictment. From this conditional plea of guilty, Echegoyen appeals the district court's denial of his motions to suppress. We affirm.

## BACKGROUND

The issues surrounding this appeal relate to two searches conducted at a residence in Idyllwild, California and to a later search conducted on a forty-acre ranch in Nipomo, California.

### Searches of the Idyllwild Home

On May 21, 1982, Riverside County sheriffs made a warrantless entry and search of a residence located on Tahquitz Road in Idyllwild, California.[1] The appellant, his brother, Jaime Echegoyen, and a third man, Fred Stegman, were in the house and were arrested at that time. In addition, equipment and chemicals used in processing cocaine and a quantity of cocaine were also seized. The facts surrounding the search are detailed below.

At approximately 12:30 a.m. on May 21, 1983, Jim Jacobson, a resident of Tahquitz Road, was awakened by what he thought to be the odor of a chemical. Jacobson noticed that the odor was coming from the outside air. He then notified the Riverside County Sheriff's Office, and two officers responded to the call. These officers met Jacobson on Tahquitz Road, approximately one-eighth of a mile from Jacobson's house. Jacobson and the officers walked back up

---

1. Idyllwild is a small community in the forest area of the San Jacinto mountains. It does not have its own police force; it is serviced by the Riverside County Sheriff's Office, located approximately forty-five miles away.

the road to Jacobson's house. While walking back to the house, one of the detectives recognized the smell as that of ether.

The officers determined that the smell was emanating from the residence located at 25050 Tahquitz Road. The deputies suspected that this house, in addition to being a fire hazard, was also the scene of illicit narcotics activity. With this in mind, the officers called a back-up deputy and the local fire department to the scene. The firefighter who arrived believed that the flammable ether posed a serious fire hazard and that immediate action was necessary.

Thereafter, the deputies, without the aid of the firefighter, approached the house and entered through the open sliding glass doors. Rodolfo Echegoyen and Fred Stegman were arrested as they attempted to flee from the residence. A third person, Jaime Echegoyen, was found sleeping in one of the bedrooms, and he was also arrested. The deputies then searched a truck and guesthouse on the property for other suspects. No other suspects were found, but chemicals were seen in the rear of the truck.

After the suspects were in custody, the deputies, joined by the firefighter, re-entered the cabin to eliminate the fire hazard. They turned off the gas burners on the kitchen stove, opened the windows for ventilation, and inspected the residence for any other open flames. While conducting this inspection, the deputies saw drug processing equipment and chemicals, and a quantity of white powder, later identified as cocaine. They also detected the smell of ether and acetone.

The deputies and the firefighter then left the residence and placed a call to the Riverside Sheriff's Office, requesting that narcotics agents join them to take over the investigation. The officers then waited outside for the narcotics agents to arrive.

Two narcotics agents arrived and entered the residence. Based on what they saw and what was told to them by the other detectives, the narcotics agents left the area to obtain a search warrant. The agents returned, executed the warrant, and seized the chemicals, equipment, and cocaine. Prior to that time, nothing had been removed from the residence.

Defendants Rodolfo and Jaime Echegoyen filed a motion to suppress the evidence seized from this residence. On November 14, 1983, the district court denied the motion. The district court held, *inter alia*, that (1) exigent circumstances existed for the warrantless entry and search of the residence; (2) the later entry by the narcotics officers was a lawful, limited entry done for the purposes of avoiding a possible explosion; (3) a search warrant would have inevitably been issued for this search; and (4) the search warrant that was issued stated probable cause without regard to information derived from the second entry by the narcotics agents. The district court also stated that the defendants' standing to assert these motions would be "assumed" by the court. Following the denial of the motion, Rudolfo Echegoyen entered a conditional plea of guilty under Fed.R.Crim.P. 11(a)(2), and was convicted.

### The Search of the Nipomo Ranch

On March 16, 1983, the California State Police executed a search warrant for a forty-acre ranch in Nipomo, San Luis Obispo County, California. The property searched belonged to Raymond Alexander. Upon entering the property, the officers found equipment and chemicals customarily used to operate a cocaine processing facility and seventy pounds of cocaine. The officers also arrested Rudolfo Echegoyen, Raymond Alexander, Helmur Vizcarre, Jaime Echegoyen and Luis Pino-Solari, all of whom were present at the search. These defendants were subsequently indicted for various narcotics law violations.

Following his arrest at Nipomo, Echegoyen entered an initial plea of not guilty. He and his codefendants arrested at the ranch also filed a pretrial motion to suppress all the evidence seized at the ranch. In the papers supporting the motion, it was contended, *inter alia*, that the affidavit

supporting the search warrant was insufficient to establish probable cause.[2]

On November 7, 1983, the district court denied the motion to suppress, holding that the affidavit contained "sufficient reliable information to sustain the state court's issuance of the warrant."

Following the denial of this motion, the defendant entered a conditional plea of guilty under Fed.R.Crim.P. 11(a)(2), and was convicted.

## DISCUSSION

### A. *The Conditional Guilty Pleas*

In addition to attacking the merits of the defendant's appeal, the government raises a procedural matter which it claims precludes Echegoyen from raising on this appeal any issues surrounding the search of the Nipomo Ranch. The government contends that the defendant, in entering his conditional guilty plea, reserved his right to appeal only those issues arising from the search of the residence in Idyllwild. The government notes that, under the Federal Rules of Criminal Procedure governing conditional pleas of guilty, the defendant must "reserv[e] in writing the right, on appeal from the judgment, to review the adverse determination of any specified pretrial motion." Fed.R.Crim.P. 11(a)(2). The government points out that Echegoyen, in filing his "Reservation of Issue on Appeal pursuant to Rule 11(a)(2), Fed.R.Crim.P." reserved his right to appeal only from the judgment and conviction on Count Six. The only adverse determination relating to Count Six involves the denial of the motion to suppress evidence seized from the Idyllwild residence. The government argues, therefore, that the defendant can only appeal this ruling and cannot appeal any issues relating to the search of the Nipomo Ranch which related only to Count Seven.

Echegoyen concedes that his written notice of appeal only reserves the right to appeal as to Count Six. However, he argues that an examination of the transcript of the hearing at which he entered his guilty plea reveals that the court, the government, and the defendant all understood that the guilty pleas entered as to Counts Three, Six, and Seven were conditional upon the defendant's right to appeal adverse rulings relating to all these counts. Echegoyen asserts that this understanding among all the parties satisfies when he asserts the policy behind Rule 11(a)(2) that the court and the government acquiesce in the entry of a conditional plea.

Recent precedent from this circuit dictates that Echegoyen's failure to reserve in writing his right to appeal any adverse rulings relating to Count Seven precludes him from challenging the legality of the entry and search of the Nipomo Ranch.

In *United States v. Alexander*, 761 F.2d 1294 (9th Cir.1985), the owner of the Nipomo Ranch, codefendant Raymond Alexander, also contested the validity of the Nipomo Ranch search. Alexander had also entered a conditional plea of guilty under Fed.R.Crim.P. 11(a)(2). *Id.* at 1303. Although the plea agreement did not reserve any issues in writing, the parties did enter into a stipulation as to the issues that would be appealed. *Id.* at 1303. The defendant, however, sought to raise three issues on appeal that were not reserved in the stipulated plea agreement. *Id.* In *Alexander* we held that "the[se] three issues ... were not included in the plea bargain, and we decline to rule on them." *Id.*

A more detailed discussion of Fed.R.Crim.P. 11(a)(2)'s requirement that the conditional guilty plea agreement reserve appellate review only of specified pretrial motions is found in our recent case of *United States v. Carrasco*, 786 F.2d 1452 (9th Cir.

---

**2.** Echegoyen and the others arrested at the scene also contended that the search warrant was invalid because it was based on information obtained from an illegal aerial search, and the warrant itself was overbroad in that it authorized a general search of a forty-acre area. The district court rejected these arguments. We affirmed the district court's rulings on those issues. *United States v. Alexander*, 761 F.2d 1294 (9th Cir.1985). Indeed, the validity of aerial searches was recently upheld by the Supreme Court. *California v. Ciraolo*, — U.S. —, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986).

1986). In *Carrasco*, the government offered a plea agreement wherein the defendant would enter a conditional plea to one count in exchange for the government moving to dismiss another count. *Id.* at 1453. The defendant "accepted the plea agreement, but the government withdrew the offer before the pleas were entered." *Id.* at 1453. The court denied the suppression motion as to Count One. The defendant then pled guilty unconditionally to the first count and prepared for trial on the second count. *Id.* at 1453. The district court dismissed Count Two *sua sponte. Id.* The defendant appealed the district court's denial of her motion to suppress evidence pertaining to the first count. We held that, because a valid conditional guilty plea had not been entered, we had no jurisdiction to decide the appeal. *Id.*

In *Carrasco*, we elaborated on the purposes behind Rule 11(a)(2) by noting that:

> Rule 11(a)(2) requires that a conditional plea include a writing and have "the approval of the court and the consent of the government." Fed.R.Crim.P. 11(a)(2). The writing requirement serves several purposes: it ensures that the plea is entered with "the considered acquiescence of the government"; it prevents "post-plea claims by the defendant that his plea should be deemed conditional merely because it occurred after denial of his pretrial motions"; and it enables the court to verify that the issues reserved for appeal are material to the disposition of the case.

*Id.* at 1454 (citation and footnote omitted).

In applying this statement in *Carrasco*, we first stated that:

The "writing" that Carrasco offered, a simple notice that the plea was intended to be conditional, did not specify which pretrial issues would be reserved for appeal and thus lends little support to Carrasco's contention that there was "considered acquiescence" by the government and approval by the court.

*Id.* at 1454.

We then concluded that:

> *In the absence of a special writing setting forth the issues to be reserved,* and in the face of the government's denial of any assent to the plea being conditional and the ambiguity in each side's remarks, we cannot conclude that the government assented to a conditional plea. Accordingly, we hold that Carrasco has not entered a valid conditional plea and that we have no jurisdiction over her appeal of the denial of the motion to suppress evidence.

*Id.* (emphasis added).

■ Our holdings in *Alexander* and *Carrasco* required that Echegoyen state in writing any issues he wished to reserve for appeal. Because Echegoyen did not reserve in writing issues arising from the search of the Nipomo Ranch, only the issues surrounding the search of the Idyllwild residence are properly before us. *Accord, United States v. McHugh,* 583 F.Supp. 290, 293–94 (D.R.I.1984) (cited with approval in *Carrasco,* and holding that Rule 11(a)(2) required "a document emanating from the defendant, reviewable by the court and the prosecutor....").[3]

3. Although we need not reach any issues raised by Echegoyen as to the validity of the Nipomo Ranch search, we deem it appropriate to comment on one argument asserted by Echegoyen. Specifically, he asserts that the district court erred in using the standard in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), to review the affidavit in support of the search warrant. He argues that this standard should not be applied to a search executed before the *Gates* decision was handed down; instead, he contends that the earlier two-prong test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. Unit-*

*ed States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) should apply to this search.

This argument clearly ignores dispositive case law on this point. In *United States v. Estrada,* 733 F.2d 683 (9th Cir.), *cert. denied,* 469 U.S. 850, 105 S.Ct. 168, 83 L.Ed.2d 103 (1984), we agreed with the Fifth Circuit case of *United States v. Mendoza,* 727 F.2d 448 (5th Cir.1984) which held that *Gates* applies to all decisions arising on direct review when *Gates* was decided. This conclusion was applied in *United States v. Alexander,* 761 F.2d 1294, 1300 (9th Cir.1985), where this court applied the *Gates* standard in assessing a claim by Echegoyen's codefendants, Lazarte, Solari, and Alexander,

## B. *Search of the Idyllwild Residence*

### 1. *Standing*

The district court stated that it would assume that Rodolfo Echegoyen and the other defendants had standing to contest the search at the Idyllwild home.

The government asserts in this appeal that Echegoyen does not have standing to challenge this search. In particular, the government argues that Echegoyen was a casual, short-term visitor to these premises, who had only been there a short period of time before the arrests occurred. The government asserts that, under this set of circumstances, Echegoyen was a mere visitor at the time of the search. Thus, the government argues that Echegoyen lacks standing because he had no reasonable expectation of privacy in the property searched.

Echegoyen argues that the permission given him to use and to sleep at the Idyllwild home entitled him to a legitimate expectation of privacy in the property searched. Consequently, he asserts that he has standing to contest the search.

Earlier cases in this circuit have held that "[w]here the facts are not in dispute, this court may review the question of standing *de novo.*" *United States v. Kuespert,* 773 F.2d 1066, 1067 (9th Cir. 1985) (citing *United States v. McConney,* 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *United States v. Pollock,* 726 F.2d 1456 (9th Cir.1984). In the instant case, the facts concerning Echegoyen's relationship to the property searched are clearly stated in the record and are not disputed by the parties. Accordingly, we review the standing issue *de novo.*

Since *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court has held that issues of standing are to be analyzed under substantive Fourth Amendment doctrine. Accordingly, the defendant must have a "legitimate expectation of privacy in the item seized and the place searched." *United States v. Pol-*

*lock,* 726 F.2d 1456, 1465 (9th Cir.1984) (citing *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980)). Defendant must exhibit "an actual (subjective) expectation of privacy [and that expectation is] one that society is prepared to recognize as reasonable." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). "The critical inquiry centers on the kind of intrusion that a free society is willing to tolerate." *United States v. Kuespert,* 773 F.2d 1066, 1068 (9th Cir.1985).

It is clear that defendant's mere presence at the place searched would not give him standing. *Rakas,* 439 U.S. at 142–43, 99 S.Ct. at 429–30. But the facts in this case reveal that Echegoyen did have a legitimate expectation of privacy in the premises searched. Echegoyen was an invited overnight guest who had permission to be on the premises when the searches occurred. Moreover, it would appear that Echegoyen, with his involvement in the cocaine processing operation, would have an interest in the items seized. Accordingly, it would appear that the defendant has standing to contest the search of the Idyllwild residence. *See United States v. Guerrero,* 756 F.2d 1342, 1348 (9th Cir. 1984) (status as overnight guest sufficient for standing); *United States v. Pollock,* 726 F.2d 1456, 1465 (defendant who participated in moving drug laboratory and chemicals from one place to another, used the final site of the lab to manufacture illicit drugs, was on the premises during late night and early morning hours, and was present at time of search had standing).

### 2. *Merits*

#### (a). *Standard of Review*

We uphold the district court's findings of fact at a suppression hearing unless they are clearly erroneous. *United States v. Feldman,* 788 F.2d 544, 550 (9th Cir.1986).

The ultimate issue of whether exigent circumstances justify a warrantless entry

that the same affidavit at issue here did not establish probable cause.

and/or search is resolved under the *de novo* standard. *United States v. McConney,* 728 F.2d 1195, 1204–05 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### (b). *Discussion*

Echegoyen claims that the behavior of the deputies before, during, and after the search reveals that the alleged exigent circumstances were nothing more than a pretext to allow a warrantless search. Specifically, Echegoyen points to the following facts: the officers initially met with Jacobson down the road to avoid making their presence known; despite claims of an emergency situation, the officers waited approximately six hours from the time they arrived to enter the home; moreover, the officers entered the home with weapons drawn and without knocking or announcing their presence prior to entering. Echegoyen also maintains that in the six hours the officers waited before they actually entered the residence, there was more than ample time to obtain a telephonic search warrant.

Conversely, the government claims that the record demonstrates that a bona fide exigency existed, and the warrantless search was, therefore, justified. The government also asserts that the officers' actions in dealing with the emergency belie the claim that the entry into the cabin was merely a pretext to avoid the requirement of a warrant.

As noted earlier, this court's initial inquiry is to determine whether the district court's findings of fact at the suppression hearing are clearly erroneous.

An examination of the district court's findings of fact regarding this search reveal that these findings are not clearly erroneous. Essentially, the district court stated and the evidence supports the conclusion that there was a potentially dangerous fire hazard present at that time. The circumstances also indicated that it was reasonable for the officers to conclude that illicit drug activity was taking place. The officers acted out of concern for the safety of the area and their own safety. Moreover, at the initial entry, the officers did not conduct any search of the area except to secure the suspects and to reduce the fire danger. The second entry was also done to inspect the premises to determine if any public safety hazard remained. The district court's findings of fact are supported by the evidence, and are, therefore, not clearly erroneous.

Turning to the next step in the analysis, this court must now determine whether exigent circumstances existed to allow the warrantless entry and search.

Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers and other persons, the destruction of relevant evidence, the escape of the suspects or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Included within this definition of exigent circumstances is "[t]he need to protect or preserve life or avoid serious injury...." *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978) (quoting *Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir.), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963)); *United States v. Martin,* 781 F.2d 671 (9th Cir.1985) (exigent circumstances justify warrantless entry to determine cause of explosion and to ensure that additional explosions do not occur).

 The record in this case establishes that the existence of an explosive fire hazard and the possibility of illegal drug activity were exigent circumstances that justified the initial warrantless entry. The deputies' testimony as to chemical smell, the activity in the cabin, the early-morning hour, the remoteness of the Idyllwild area, and the limited availability of firefighting

resources all justify the initial entry.[4] Consequently, the contention that the alleged exigency was a mere pretext to avoid the warrant requirement is without merit. A bona fide exigency did exist. This conclusion is buttressed by the behavior of the officers upon entering the dwelling. Immediately after serving the defendants and assuring themselves there were no other suspects on the property, the deputies proceeded to reduce the hazards of fire and explosion. They turned off the burners, ventilated the premises, and summoned the firefighters to inspect the property. Finally, there is no merit to Echegoyen's contention that the officers should not have entered with their guns drawn. The possible danger of confronting armed suspects in the late evening, without familiarity with the layout of the house, and without knowing the number of suspects present justified the use of the weapons. Accordingly, exigent circumstances were present to justify the initial entry.

■■■ This court's inquiry, however, is not yet complete. "Exigent circumstances alone … are insufficient as the government must also show that a warrant could not have been obtained in time." *United States v. Good*, 780 F.2d 773, 775 (9th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 1523, 89 L.Ed.2d 920 (1986).[5] Inclusive in this

mandate, the government must also be prepared to show that a telephonic warrant was unavailable or impractical. *Id.* at 775; *United States v. Manfredi*, 722 F.2d 519, 523 (9th Cir.1983). In this regard, Echegoyen claims that the government had ample time to obtain a telephonic warrant.[6]

■■■ For the following reasons, however, it appears that it would have been impractical to require the government to get a warrant here before taking action.

As we have stated, "obtaining a telephonic warrant is not a simple procedure." *United States v. Good*, 780 F.2d 773, 775 (9th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 1523, 89 L.Ed.2d 920 (1986). "A telephonic warrant may not be obtained simply by calling a magistrate. Among other things, a 'duplicate original warrant' must be prepared in writing and read to the magistrate verbatim." *United States v. Manfredi*, 722 F.2d 519, 523 (9th Cir.1983) (citing *United States v. Hackett*, 638 F.2d 1179 (9th Cir.1980), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981)).

■■■ It appears that the officers, in the instant action, did not attempt to get a warrant. But as the district court's findings of fact indicate, "the officers did not have the necessary forms" to get a telephonic warrant (*i.e.*, the duplicate original

---

4. Having concluded that this initial entry was justified under exigent circumstances, the court need not reach the issue of whether a good faith exception should be applied to warrantless searches that do not fall under the exigent circumstances exception to the warrant requirement. Nonetheless, we underscore the fact that this court has clearly rejected any suggestion that the good faith exception applies to invalid warrantless searches. *United States v. Whiting*, 781 F.2d 692, 698–99 (9th Cir.1986) (good faith exception not applicable to warrantless searches); *United States v. Miller*, 769 F.2d 554, 560 n. 5 (9th Cir.1985) (same); *see also United States v. Morgan*, 743 F.2d 1158, 1165 (6th Cir. 1984), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985) (refusing to extend good faith exception to warrantless search which the government claims fell under the exigent circumstances exception).

5. Exigent circumstances necessarily imply that there is insufficient time to get a warrant.

6. Appellant asserts that "within the six hours spent at the location, certainly a warrant could have been obtained." Appellant's Opening Brief, p. 33. This statement does not accurately reflect the record. It appears that Jacobson contacted the Riverside Sheriff's Office at approximately 1:00 a.m. Taking into account the forty to forty-five minute drive to Tahquitz Road, the officers would have arrived at approximately 2:00 a.m. The record also reveals that the narcotics officers who were contacted after the initial search received that phone call at approximately 5:30 a.m. Thus, at the outside, the officers spent approximately two and one-half to three hours at the location before making their initial entry. Moreover, the officers at the location displayed reasonable and prudent behavior during their wait. The officers promptly interviewed Jacobson, summoned and waited for fire fighting personnel once they determined any potential fire hazard existed, and called for a back-up officer before entering the home. These precautions took approximately two hours.

which must be read to the judicial officer). Moreover, given the remoteness of the Tahquitz Road area, the late night hour, and the fact that the officers were approximately forty to forty-five minutes from their station, it is fair to assume that a telephonic warrant would have taken quite some time to secure. In the circumstances here, such a delay could have had dangerous effects. The officers were faced with a potentially serious fire hazard and potentially dangerous drug traffickers in an isolated mountain community with little fire and police protection. Under these circumstances, we conclude that "the delay associated with obtaining a telephonic warrant would have unduly increased the risk ... that the officers reasonably believed to be [present at] the [Tahquitz Road residence]." *United States v. Good,* 780 F.2d 773, 775 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 1523, 89 L.Ed.2d 920 (1986). Accordingly, the initial entry was lawful.[7]

▪ Moreover, the subsequent entry by the narcotics detectives is also as valid as a continuation of the initial lawful entry. *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978).

In *Tyler,* a fire broke out in a furniture store. The firefighter entered the building to put out the fire. Evidence of arson was found in the store, and a fire detective was called to the scene. He attempted to investigate the scene, but heavy smoke forced him to leave the premises. Four hours later the detective returned, entered the store to inspect the burned property, and removed physical evidence from the scene.[8] The *Tyler* Court upheld the initial entry as justified by the exigency created by the fire. Significantly, the *Tyler* Court also held that the re-entry later in the day was "no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." 436 U.S. at 511, 98 S.Ct. at 1951. In the instant case, the subsequent entry by the narcotics officers was based on the need to use their expertise in inspecting the premises for a possible fire hazard. Consequently, this second entry was merely a continuation of the initial lawful entry because both were done to alleviate the exigent circumstances. Accordingly, any evidence observed in plain view while making this entry should not be suppressed.

Having concluded that both warrantless entries were lawful, and all the evidence observed during the course of these entries was lawfully obtained, it necessarily follows that the search warrant subsequently secured by the narcotics officers was valid. Accordingly, the district court's denial of the motion to suppress is AFFIRMED.

7. The government also asserts that, even if the initial entry was unlawful, the evidence seized should not be suppressed because a search warrant would have inevitably been issued in this case. In other words, the government maintains that the observations of the deputies, coupled with the expertise of the narcotics officers, were sufficient to create probable cause to obtain a search warrant to search the home. Thus, the government asserts that the evidence at issue here would have inevitably been seized through a search warrant. Therefore, under the "inevitable discovery" exception of *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) this evidence should not be suppressed.

Although this exception to the exclusionary rule has been recognized in this circuit, *United States v. Huberts,* 637 F.2d 630, 639 (9th Cir. 1980), *cert. denied,* 451 U.S. 975, 101 S.Ct. 2058, 68 L.Ed.2d 356 (1981), it has no application to the facts of this case. In *Nix,* police officers discovered the location and condition of the victim's body through an unlawful interrogation of the defendant. The *Nix* court, nonetheless, upheld the admissibility of this evidence because it concluded that an independent ground search simultaneously conducted by the police would have inevitably discovered the evidence. *Nix,* 467 U.S. at 449–50, 104 S.Ct. at 2512–13. In this case, however, there were not two independent investigations or searches in progress; there was but one continuous investigation. The *Nix* holding is, therefore, inapplicable to this case. Moreover, to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment.

8. The fire detective in *Tyler* also made a warrantless entry a month later to inspect the property and gather evidence. The Supreme Court held that entry unlawful. However, that holding has no application to the facts of the instant appeal.