977 F.2d 587
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Andrew B. BLOOM, Adelle S. Bloom, Steven Bloom and Stacy
Bloom, Plaintiffs-Appellees,
v.
CITY OF SCOTTSDALE, and its Elected Officials, et al., Defendants,
and
Frank Hylton; Bernard Hill; Patrick Sasone, Defendants-Appellants.
 No. 91-15472.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 15, 1992.
Decided Oct. 2, 1992.
 
 Before FLETCHER, POOLE and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Bernie Hill, Patrick Sasone and Frank Hylton, officers in the Scottsdale, Arizona police department, appeal a judgment of $75,000 against them in a suit filed under 42 U.S.C. § 1983 by members of the Bloom family. They argue the district court erred in directing a verdict against them on the issue of liability, and in refusing to instruct the jury on their qualified immunity defense. Additionally, they contend that the jury's award of damages was not supported by the evidence. We affirm in part and reverse in part.
 
 FACTS
 
 3
 On June 6, 1986, the Scottsdale Police Department received a phone call from James Wray, who had been driving down Shea Boulevard. Wray reported seeing a stocky man wearing jeans and no shirt waving a gun and staggering down the south side of Shea Boulevard near 68th Place. The dispatcher sent out a call based on this information, and several officers went to the location.
 
 
 4
 Officer Bernie Hill was the first to arrive in the area. He saw a man standing in the driveway of the Bloom residence, a house at the corner of 68th Place and Shea Boulevard. Andrew Bloom testified that at the time he was outside his house watering plants. At trial, there was substantial dispute as to whether Bloom matched the description Wray had given.
 
 
 5
 Hill saw the man go into the house through the garage entrance. Using his police radio, Hill informed other officers about what he had seen. Shortly afterward, officer Patrick Sasone and Sergeant Frank Hylton arrived on the scene.
 
 
 6
 Hill saw the man subsequently identified as Bloom emerge from the house. Hill drew his weapon and ordered Bloom to put his hands up and walk toward the officers. Apparently, the officers initially had some difficulty securing Bloom's cooperation. The police ordered Bloom to lie down in the driveway of the house; they frisked him and found a small pocket knife. The officers then walked Bloom away from the house to their police vehicles.
 
 
 7
 The police informed Bloom they were going to enter the house and determine whether the residents were all right. Hylton testified he did not ask permission to enter, but rather merely stated that police would do this. Bloom became quite agitated, and stated that he did not want the officers to go in. Bloom told police his two young children and their elderly grandmother were in the house.
 
 
 8
 At Hylton's direction, while Bloom was detained outside, Officers Hill and Sasone went to the house and knocked on the door. Stacy Bloom, Andrew Bloom's daughter, aged 12 at the time of the incident, came to the door. She called her brother, Steven Bloom, aged 16, who spoke with the officers. There is conflicting testimony as to what was said to the children. Stacy and Steven both testified that they did not recall giving the police permission to enter the house. They also do not recall the police inquiring after their welfare. Officer Sasone testified he did not recall asking permission, but told the children that the police wanted to come in and take a look around to make sure that everything was "all right inside the house." In any case, Officers Sasone and Hill entered the house and walked through the rooms, although they did not do a detailed search. During their inspection, they observed several guns in the house.
 
 
 9
 While Officers Hill and Sasone were in the house, Lieutenant James arrived on the scene. Finding nothing out of order, the police left the house. All the officers then departed from the scene. No charges were ever brought against Bloom.
 
 
 10
 At the time of the incident, Andrew Bloom was on parole from a federal narcotics conviction. One of the conditions of parole was that he was not allowed to have weapons in his residence. Bloom informed his parole officer about the June 6, 1986 incident. The parole officer contacted Scottsdale police, who informed him they had seen weapons in Bloom's house. The parole officer also called Officer John Hendrickson, of the federal Bureau of Alcohol, Tobacco and Firearms. Hendrickson obtained a warrant to search the Bloom residence. During a search executed on June 19, 1986, numerous weapons were found. Bloom's parole was revoked.
 
 
 11
 Andrew, Steven and Stacy Bloom, as well as Bloom's wife Adele who had been in Texas at the time of the incident, filed suit in federal district court under 42 U.S.C. § 1983 against the City of Scottsdale Police Department, Scottsdale Police Chief Fred Collins, Lieutenant James, Sergeant Hylton and Officers Hill and Sasone. The Blooms alleged that Officers Hill and Sasone's search of the house violated their Fourth Amendment rights, and sought compensatory and punitive damages. The case was tried to a jury.
 
 
 12
 The district court granted directed verdicts in favor of the Police Department, Collins and James, and against Adele and Steven Bloom. It also ruled that the Blooms could not seek punitive damages, nor could Bloom seek damages for the revocation of his parole. After both sides had rested, the district court entered a directed verdict in favor of Andrew and Stacy Bloom on the issue of liability, and refused to instruct the jury on the remaining defendants' qualified immunity defense. On the only issue remaining for it to decide, the jury awarded $25,000 in damages to Andrew Bloom and $50,000 to Stacy Bloom. The court denied defendants' motion for a new trial, and, pursuant to 42 U.S.C. § 1988, awarded attorneys' fees of $20,295 to the plaintiffs.
 
 
 13
 Sergeant Hylton and Officers Hill and Sasone (the "appellants"), appeal the judgment against them and the award of attorneys' fees.
 
 DISCUSSION
 
 14
 I. Did the district court err in entering a directed verdict in favor of Andrew and Stacy Bloom on the issue of liability?
 
 
 15
 Before determining how it would instruct the jury, the district court, sua sponte, entered a directed verdict on the issue of liability in favor of Andrew and Stacy Bloom. Thus, the district court refused to instruct the jury on the issues of liability and the defendant's qualified immunity defense. The appellants argue that the district court erred in entering the directed verdict. They contend, first, that the district court erred in not submitting to the jury the question of whether their search of the Bloom's house was justified by the "exigent circumstances" or "emergency aid" exception to the warrant requirement. They also argue that they were entitled to a jury instruction on the issue of qualified immunity. To resolve both of the appellants' challenges, we must address the legality of the search of Bloom's home.
 
 A. Standard of Review
 
 16
 The district court's decision to enter a directed verdict is reviewed de novo. A directed verdict is proper when, in the light most favorable to the nonmoving party all possible inferences are drawn in favor of that party, "the evidence permits only one reasonable conclusion as to the verdict." Donoghue v. County of Orange, 848 F.2d 926, 932 (9th Cir.1987).
 
 
 17
 B. Did the exigent circumstances exception to the warrant requirement apply?
 
 
 18
 A warrantless search is per se unreasonable under the Fourth Amendment; this rule is "subject only to a few specifically established and well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978). One of these exceptions is the "exigent circumstances" exception; appellants rely principally on a variant of that exception which can be called the "emergency aid" exception.
 
 
 19
 This court has set forth the following "standard" for the exigent circumstances exception:
 
 
 20
 Exigent circumstances are those in which a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained. The need for an immediate search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement. There must be no practical way to avoid these risks and yet follow the Constitution's mandate of detached judicial supervision of such intrusions.
 
 
 21
 United States v. Robertson, 606 F.2d 853, 859 (9th Cir.1979). This court has also described exigent circumstances as "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984). In determining whether exigent circumstances existed, the court considers "the totality of the circumstances known to the officer at the time of the warrantless intrusion." United States v. Warner, 843 F.2d 401, 403 (9th Cir.1988).
 
 
 22
 The Supreme Court has noted that the need to aid or protect potential victims constitutes an exigent circumstance. "Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.... The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Mincey, 437 U.S. at 392 (footnotes and citation omitted). Appellants here rely specifically on an Arizona Supreme Court case regarding the "emergency aid" doctrine. In State v. Fisher, 686 P.2d 750 (Ariz.), cert. denied, 469 U.S. 1066 (1984), the court adopted the test for the application of this exception:
 
 
 23
 (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
 
 
 24
 (2) The search must not be primarily motivated by intent to arrest and seize evidence.
 
 
 25
 (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.
 
 
 26
 Fisher, 686 P.2d at 760 (citation omitted). In Fisher, a resident of a condominium complex was murdered. While police were searching her apartment for leads, they received a call from her neighbor, who had wanted to ask the victim if she knew where the managers of the complex were; the managers had not been in their apartment for 39 hours. When the neighbor heard about the murder, he expressed concern; forty-five minutes later, the police searched the managers' apartment and found evidence linking them to the murder. The court held that the officers could reasonably believe that there may have been victims in the managers' apartment who could possibly be saved. It found that the forty-five minute delay did not "in and of itself, belie the police officers' assertion that they believed an emergency was at hand." 686 P.2d at 761.
 
 
 27
 Here, the district court entered a directed verdict in favor of the plaintiffs on the liability issue because it found no reasonable jury could find exigent circumstances or an emergency justified the officers' search of the Bloom home.
 
 
 28
 We agree with the district court. While the officers originally received a tip about an armed man, nothing they observed and nothing about subsequent events could give rise to a belief that Bloom was the man or that anyone was in danger. When the officers confronted Bloom, they found he was unarmed; nothing in his demeanor suggested he was dangerous. Bloom's agitation at the prospect of a search was explained by the ordeal the officers had already put him through (drawn guns, flashlights in his eyes, search of Bloom while spread-eagled on the driveway, refusal to let him go back to the house) and the concern he expressed for his family members. Finally, when the officers spoke with Steve and Stacy Bloom, nothing in the children's words or demeanor suggested there was anything amiss in their home.
 
 
 29
 The officers' decision to search the house was apparently based not on any particularized belief that someone in the home might be hurt or in danger, but on the department's policy of performing routine "welfare checks". The exigent circumstances exception allows search without warrant only in situations where the police confront an emergency or potential danger to the officers or others. Entry into the home without a warrant is justified only if, on the specific facts before them, the police have "reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." Fisher, 686 P.2d at 760. The exception cannot be used as an excuse for a "routine" check.
 
 
 30
 We thus affirm the district court's directed verdict on the issue of liability.
 
 
 31
 II. Were the appellants entitled to a jury instruction on qualified immunity?
 
 A. Standard of Review
 
 32
 A party is entitled to have its theory presented to the jury if the theory has both legal and factual support. Los Angeles Memorial Coliseum Com'n v. National Football League, 726 F.2d 1381, 1398 (9th Cir.), cert. denied, 469 U.S. 490 (1984). The claim of failure to submit a proper jury instruction is a question of law reviewable de novo. Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir.1988).
 
 
 33
 Qualified immunity is an affirmative defense, for which the defendant bears the burden of proof. Id. This court has held that the defense of qualified immunity may be asserted at trial when there are triable issues of fact as to whether a reasonable belief exists that a search is lawful, viewed in light of the settled nature of the law. Thorsted v. Kelly, 858 F.2d 571, 575 (9th Cir.1988).
 
 B. The Qualified Immunity Defense
 
 34
 In Anderson v. Creighton, 483 U.S. 635 (1987), the Supreme Court observed: "We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials--like other officials who act in ways they reasonably believe to be lawful--should not be held personally liable. The same is true of their conclusions regarding exigent circumstances." 483 U.S. at 641. Thus, in determining whether a government official is entitled to qualified immunity, the "relevant question" "is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." Id. The Court noted that the subjective beliefs of the official are irrelevant. Id.
 
 
 35
 In Anderson v. Creighton, the Court indicated that the law regarding a violation of constitutional rights is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 640.
 
 
 36
 To determine whether the law was "clearly established", the court "review[s] all available decisional law including decisions of state courts, other circuits, and district courts to determine whether the right was clearly established." Vaughan v. Ricketts, 859 F.2d 736, 739 (9th Cir.1988), cert. denied, 490 U.S. 1012 (1989) (citations omitted).
 
 
 37
 Here, the law as to the rights of the Blooms was clearly established at the time of the search: a warrantless search of their home was illegal absent exigent circumstances. Cases such as Mincey v. Arizona, United States v. Robertson and State v. Fisher had established when the exigent circumstances or emergency aid exception would apply.
 
 
 38
 The issue, then, is whether officers in the position of the appellants could reasonably have believed that exigent circumstances existed. Relying on our analysis above, we conclude that such a belief would have been unreasonable. Again, there was no suggestion that anyone in the house was in danger, or that any other emergency existed. Therefore, because there was no factual support for the requested qualified immunity instruction, the district court did not err in refusing to give it.
 
 
 39
 III. Was the jury's award of damages supported by the evidence?
 
 
 40
 The jury awarded damages of $50,000 to Stacy Bloom and $25,000 to Andrew Bloom. The appellants argue that these awards must be reversed because the Blooms presented no evidence to support them.
 
 
 41
 This court will uphold a "jury's finding of the amount of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence or only based on speculation or guesswork." Los Angeles Memorial Coliseum Com'n v. Natl. Football League, 791 F.2d 1356, 1360 (9th Cir.1986) (citations omitted), cert. denied, 484 U.S. 826 (1987).
 
 
 42
 The Supreme Court has held that "the abstract value of a constitutional right may not form the basis for § 1983 damages." Memphis Community School Dist. v. Stachura, 477 U.S. 299, 308 (1986). However, a plaintiff may recover for mental and emotional distress caused by a violation of her rights. Carey v. Piphus, 435 U.S. 247, 264 (1978); Jones v. Los Angeles Community College Dist., 702 F.2d 203, 207 (9th Cir.1983).
 
 
 43
 Neither Andrew nor Stacy Bloom stated they had suffered physical or economic harm. Stacy Bloom testified that she suffered emotional distress as a result of the incident, and continues to have difficulty dealing with the Scottsdale police department.
 
 
 44
 There was thus evidence to support an award of damages to Stacy Bloom for emotional distress. The appellants point out that Stacy did not seek counseling, nor did she present expert testimony as to her state of mind. However, this court has upheld the award of damages for emotional distress without requiring such testimony. See Chalmers v. City of Los Angeles, 762 F.2d 753, 761 (9th Cir.1985) (plaintiff who testified as to anguish, embarrassment, anxiety and humiliation established compensable psychological harm) amended, 808 F.2d 1373 (9th Cir.1987). Moreover, the jury's award of $50,000 to Stacy Bloom was not "grossly excessive or monstrous."
 
 
 45
 Andrew Bloom, however, did not testify that he suffered emotional distress. His only testimony as to damage he had sustained related to the revocation of his parole and his consequent loss of employment; the district court ruled that he could not seek damages on these grounds and Bloom did not object to that ruling. Thus, the jury's award of damages to him was "clearly not supported by the evidence" and must be reversed.
 
 
 46
 We thus affirm the jury's award of damages to Stacy Bloom, but reverse its award to Andrew Bloom.
 
 IV. Attorneys' Fees
 
 47
 Under 42 U.S.C. § 1988, the court may award attorneys's fees to the prevailing party in a section 1983 suit. The district court awarded $20,295 to the Blooms. The appellants do not challenge the merits of the district court's award, but rather argue that if they succeed on this appeal it should be vacated.
 
 
 48
 Because we have affirmed the decision below (with the exception of the jury's award of damages to Andrew Bloom), we do not vacate the district court's award of attorneys' fees. However, because the appellants have succeeded in obtaining a reduction of the damages against them, we decline to award attorneys' fees for this appeal to the Blooms.
 
 
 49
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3